In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **NIGHTINGALE HOME HEALTHCARE, INC.**, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CAUSE NO. 1:06-cv-1435-SEB-WTL |
| **ANODYNE THERAPY, LLC**, | ) ) ) | |
| Defendant. | ) | |

**E N T R Y**

**Defendant's Motion for Attorney Fees (doc. 140)**

After successfully defending against Plaintiff Nightingale Home Healthcare, Inc.'s Lanham Act claim, 15 U.S.C. § 1125(a)(1)(B), Defendant Anodyne Therapy, LLC seeks an award of its attorney fees, pursuant to 15 U.S.C. § 1117(a). For the reasons set forth herein, the motion is granted.

The Lanham Act permits an award of reasonable attorney fees to a prevailing party "in exceptional cases," 15 U.S.C. § 1117(a), and in the trial court's sound discretion, *S Industries, Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001) ("We will not reverse a determination for clear error unless it strikes us as wrong with the force of a 5 week old, unrefrigerated dead fish"). *Central Manufacturing, Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007). Where a defendant is the prevailing party, "exceptional cases" are those in which the plaintiff's actions in bringing and/or litigating the lawsuit were "oppressive," *id*., at 884,

1

meaning that the plaintiff's case "[1] lacked merit, [2] had elements of an abuse of process claim, and [3] plaintiff's conduct unreasonably increased the cost of defending against the suit," *id*.; *S Industries*, 249 F.3d at 627. Although this standard is usually phrased in the conjunctive, the caselaw teaches that, depending on the circumstances of a particular case, a finding of oppressiveness and an award of § 1117(a) fees may be "[b]ased solely on the weakness" of a plaintiff's claims, *S Industries*, 249 F.3d at 627, or solely on a plaintiff's egregious litigation conduct, *TE-TA-MA Truth Foundation — Family of URI, Inc. vs. World Church of the Creator*, 392 F.3d 248, 258, 263 (7th Cir. 2004).

Anodyne seeks an award of its attorney fees only for work performed between March 21, 2007, when Nightingale filed its Amended Complaint, (doc. 39), and September 18, 2008, when the Court granted summary judgment against the Lanham-Act claim, (doc. 106). Nightingale initiated this suit in Indiana state court in September 2006 with a complaint that only broadly described the facts of which it complained. Complaint (doc. 1-1). While this state-court complaint alleged that Anodyne fraudulently withheld and misrepresented information on which Nightingale detrimentally relied, it did not identify specific causes of action or indicate whether they were based on state and/or federal law. Invoking diversity jurisdiction, Anodyne timely removed the case to this Court because the parties were diverse and the complaint's demand for $100,000 compensatory and $500,000 punitive damages more than satisfied the $75,000 matter-in-controversy threshold of 28 U.S.C. § 1332(a)(1). Notice of Removal (doc. 1). Nightingale did not formally identify its legal claims under the federal Lanham Act (Count 1) and state contract, fraud, and product-liability law (Counts 2-4) until it prematurely filed an amended complaint, without leave of court, in February 26, 2007, (doc. 31). Leave was granted to file this

Amended Complaint on March 21, 2007.

Anodyne argues that this is an exceptional case because Nightingale's Lanham Act claim lacked merit, Nightingale filed and pursued the claim in bad faith, and Nightingale engaged in vexatious litigation. Familiarity with the underlying facts is assumed for the following discussion.[1]

## Lack of Merit

In its Amended Complaint, Nightingale alleged that Anodyne violated § 43(a) of the Lanham Act:

> Any person who . . . in connection with any goods . . . uses in commerce any . . .false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). The Amended Complaint alleged two false or misleading representations by Anodyne regarding its infra-red lamp device: first, that use of its lamps would be reimbursed by Medicare and, second, that its lamp is a treatment for several conditions, including peripheral neuropathy. Amended Complaint, Count I, ¶¶ 19, 20. It alleged that these representations were made in Anodyne's commercial advertising, on its website, and in its

---

[1] The factual context may be found in the two previous decisions of this Court, *Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, Cause no. 1:06-cv-1435-SEB-JMS, Entry on Defendant's Motion for Summary Judgment (doc. 69) and Defendant's Request for Oral Argument (doc. 99), 2008 WL 4367554, 2008 U.S. Dist. LEXIS 71393 (S.D. Ind., Sept. 18, 2008) (***"Nightingale I"***); *Id.*, Entry on Defendant's Motion for Summary Judgment (doc. 126), 2009 WL 1404327, 2009 U.S. Dist. LEXIS 42622 (S.D. Ind., May 15, 2009), and in the decision of the Court of Appeals for the Seventh Circuit, 589 F.3d 881 (7th Cir. 2009).

promotional material. *Id.*, ¶¶ 16-20.  By the time of summary judgment, Nightingale had dropped its reliance on Anodyne's alleged statements regarding Medicare reimbursement and added an allegation that Anodyne represented that the FDA had approved its infra-red lamps for the treatment of peripheral neuropathy.  *Nightingale I*, 2008 WL 4367554, *5 and n. 3.  Thus, the two misrepresentations on which Nightingale based its Lanham-Act claim were (1) that the FDA had approval Anodyne's lamp for the treatment of peripheral neuropathy and (2) the lamp is a treatment for peripheral neuropathy.

We quickly disposed of Nightingale's first alleged misrepresentation because Nightingale's only evidence for it were alleged oral representations made by Anodyne's salesman to two Nightingale principals and such person-to-person communications do not qualify as the "commercial advertising or promotion" that the Lanham Act makes actionable.  *Id*. 15 U.S.C. § 1125(a)(1)(B); *Sanderson v. Culligan International Co.*, 415 F.3d 620, 624 (7th Cir. 2005) ("We held in *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 804 (7th Cir.2001), that § 43(a) addresses 'promotional material disseminated to anonymous recipients'.  This leaves to state law the evaluation of oral statements and brochures at trade shows").

Next, we held that there was no genuine dispute that Anodyne's commercial advertisements and promotions stating that its lamp was a treatment for peripheral neuropathy were not false or misleading.  Nightingale's claim that they were so was based, first, on the fact that the FDA had not granted approval to Anodyne to market its lamps as a treatment for peripheral neuropathy and, second, that "treatment," without qualification, means "cure," and

Anodyne's lamp admittedly did not cure peripheral neuropathy.[2] We found these arguments to be clearly wrong on the law and the facts and, further, were disingenuous. We found that whether Anodyne had FDA pre-market approval for its statements was irrelevant to whether the statements were, in fact, false or misleading. Nightingale's own experience with using Anodyne's lamps on its patients showed their effectiveness in relieving peripheral-neuropathy symptoms, as did Nightingale's continuing use of competitor's product after discontinuing use of Anodyne's lamps.

We also held that there was no support — either presented by Nightingale or discovered on our own — for Nightingale's position that "treatment" means only "cure." In fact, we found that common usage and the medical and lay sources that we consulted uniformly defined "treatment" of a condition to include both cure of the underlying cause and relief of its symptoms. We found that peripheral neuropathy itself is a description of symptoms caused by a separate underlying disease or condition; it is not a disease or condition itself that can be "cured." We also noted that Nightingale's president, himself a physician, knew that there was no cure for peripheral neuropathy:

> Furthermore, Dr. Dev Brar, the president of Nightingale and a physician, testified
> that, while the symptoms of peripheral neuropathy can be ameliorated —
> including through the use of Anodyne's lamp — there is no cure or direct
> treatment for the condition itself.  Brar Deposition, pp. 21, 52-55, 98.

*Nightingale I*, 2008 WL 4367554, *7. Against this factual context, it was clearly unreasonable for Nightingale to interpret (if, indeed, it did so) Anodyne's representations that its lamp was a

---

[2] Nightingale never alleged or argued that Anodyne's lamp was ineffective in relieving the pain, numbness, and other symptoms associated with peripheral neuropathy and other conditions.

treatment for peripheral neuropathy as a statement that it could cure peripheral neuropathy, and it was disingenuous for Nightingale to so allege and argue in this suit.

Nightingale argues that the distinction between treatment as cure and treatment as symptom relief is not as simple as Anodyne, or the Court, contends that it is, as evidenced by our four-page analysis of the distinction on summary judgment and the Court of Appeals' description of the difference as "subtle but significant." This is an odd argument for Nightingale to be making now, however, because its argument on summary judgment was not that the distinction between treatment as cure *vs*. relief was subtle but that when Anodyne said "treatment," it could have meant only "cure." Those four pages in our summary-judgment ruling showed that we found *no* evidence that treatment means only cure; rather, the medical and lay sources that we found demonstrated that treatment carries the definitions of both cure and symptom relief. In the context of the expert professionals at Nightingale to whom Anodyne's representations allegedly were made, there could have been no reasonable confusion what was meant. Dr. Brar, Nightingale's president and a medical doctor, testified that he was aware that there was no cure for peripheral neuropathy but that symptom relief was possible. At no point did Dr. Brar or any other Nightingale decision maker aver or testify that they were unaware of the nature of peripheral neuropathy as a symptomatic condition. It was not reasonably possible, and it was disingenuous for Nightingale to allege in this suit, that Dr. Brar or any Nightingale decision maker believed that Anodyne had actually found a cure for peripheral neuropathy or that Nightingale was surprised post-purchase when Anodyne's lamps weren't curing its patients' peripheral neuropathies.

The Court of Appeals did not say that the difference between treatment of a disease and treatment of its symptoms is subtle but significant,[3] but that, in the context of FDA pre-market approval, the *marketing restriction* of a device as a treatment of a disease (or cause) and the treatment of a disease's symptoms is subtle but significant.  As we found in *Nightingale I*, Nightingale presented no evidence that Anodyne asserted that its lamp was a cure for peripheral neuropathy; at most, Nightingale's evidence showed only that Anodyne represented that it was a treatment for peripheral neuropathy.  At any rate, as we explained in *Nightingale I* and above, and as Dr. Brar and Nightingale were well aware, peripheral neuropathy is not a causal condition or disease, but a collection of symptoms for which there is no cure.

Nightingale's Lanham-Act claim lacked any merit.

### Abuse of process and litigation misconduct

The elements of abuse of process are an ulterior motive or purpose and a willful use of the process that is not proper in the regular course of the proceeding.  *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 464 (7th Cir. 2009).  Anodyne argues that Nightingale filed and litigated this suit in bad faith.  It contends that Nightingale filed this suit in order to punish Anodyne for failing to give it a price discount on new lamp units after it became known that Anodyne had exceeded its FDA marketing restrictions.  Anodyne argues that Nightingale did not genuinely believe that it was misled or was "likely to be damaged" by Anodyne's alleged misrepresentations that the FDA had approved its lamps to be marketed for the treatment of

---

[3] How such a subtlety in meaning would help Nightingale is obscure.  Nightingale was not an unsophisticated consumer and would be expected to easily grasp any such "subtle" distinction in the context of treating peripheral neuropathy.

peripheral neuropathy or that its lamp was a cure for peripheral neuropathy because it continued to use the lamps — in fact, it bought more — after it must have become evident that a cure of its patients' peripheral neuropathies was not being effected; Nightingale actively negotiated for the purchase of additional lamps after learning that Anodyne exceeded the FDA's marketing limits; and, after Anodyne finally refused Nightingale's requests for a substantial price discount on additional units, Nightingale purchased and used a competitor's product that was virtually identical to Anodyne's units and that Nightingale promoted in virtually the same way as Anodyne's. In addition, the competitor's product did not have an FDA marketing clearance for treatment of peripheral neuropathy and also was not a cure for peripheral neuropathy.

As further evidence of Nightingale's bad faith, Anodyne points to Nightingale's refusal to respond to Anodyne's discovery requests for evidence of its alleged damages and the profits that it made from using Anodyne's lamps. Nightingale is correct that proof of actual damages is not required for a Lanham-Act claim, *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204-05 (7th Cir. 1990), but its refusal to produce any evidence of actual damages or profits does support the inference that it did not genuinely believe either that it was misled or that it was likely to be damaged by Anodyne's alleged misrepresentations, and that its true motive in pursuing this suit was to punish or harass Anodyne. We are entitled to draw the inference that Nightingale continually refused to produce the requested evidence because it either did not exist or would have been disadvantageous to its allegations and claim.

None of Nightingale's advertising or promotional materials included a statement that its

8

infra-red treatments were FDA-approved for the treatment of peripheral neuropathy[4] and, by the time it became aware of the actual limits of the FDA marketing clearance, it had been successfully treating its patients with Anodyne's lamps for some time and had been making profits from the treatments. It continued to use a competitor's product with substantially the same marketing content. Evidence on Nightingale's alleged damages and profits would have been relevant to the issue of whether it genuinely believed that it had been misled or genuinely believed that it was likely to have been damaged by Anodyne's alleged misrepresentations and, thus, whether it had a Lanham-Act claim and/or believed that it had a valid claim.

Nightingale also showed bad faith when its counsel failed to appear at the final pre-trial/settlement conference with full settlement authority as ordered. This frustrated the purposes of the conference and necessitated scheduling another conference at which Dr. Brar's presence was ordered. Nightingale's conduct imposed additional costs on Anodyne and demands on the Court's time.

The lack of merit in Nightingale's Lanham-Act claim, the facts indicating that it did not genuinely believe that it was misled or likely to be damaged, and its obstructive litigation tactics demonstrate that it filed and pursued the claim not for honest purposes but to punish or harass Anodyne with the expense and disruption of litigation.

---

[4] There was also no evidence that Nightingale had reason to believe that any of its referring clients to whom it might have individually represented that its infra-red treatments were FDA-approved for the treatment of peripheral neuropathy were likely to stop referring patients as a consequence of learning about Anodyne's marketing clearance.

## Conclusion

We find and conclude that the weakness of Nightingale's Lanham-Act claim alone warrants an award of fees under 15 U.S.C. § 1117(a).  Alternatively, we find and conclude that the lack of merit in the claim coupled with Nightingale's improper motive to punish or harass Anodyne and its obstructive litigation behavior qualify this as an exceptional case and justify an award to Anodyne of its attorney fees.

## Fee amount

Anodyne seeks an award in the amount of $72,747.00, representing the work that it performed defending against Nightingale's Lanham-Act claim from the filing of the Amended Complaint to the claim's dismissal on summary judgment.  Its request is supported by the declaration of its lead counsel, (doc. 142), that breaks down the hours worked and hourly rates of the attorneys, paralegals, and legal assistants who worked on the case.  Nightingale's only comment on Anodyne's fee request is that it failed to establish that its requested fees were strictly related to defending against only the Lanham-Act claim and not Nightingale's other three claims.  Nightingale did not dispute the reasonableness of the hourly rates charged by any of Anodyne's counsel's personnel.  In reply, Anodyne's lead counsel submitted a supplemental declaration, (doc. 163), attaching his firm's billing records supporting the fee request, and an argument that it is impossible to distinguish the Lanham-Act work from the defense against the other claims.  Nightingale did not respond to the supplemental declaration or seek leave to do so.

While segregation of Lanham-Act and non-Lanham-Act work is preferred when seeking an award of attorney fees under 15 U.S.C. § 1117(a), where work on the claims is so intertwined

as to make differentiation impossible, apportionment is not necessary. *Carley Gracie v. Rorion Gracie*, 217 F3d 1060, 1069 (9th Cir. 2000). Here, Counts 1-3 were based on Nightingale's allegations that Anodyne misrepresented the extent of FDA approval for its lamps, that they were a treatment for peripheral neuropathy, and that treatments would be reimbursed by Medicare. All three allegations formed the bases of Nightingale's Count 1 claim under the Lanham Act up to and through summary judgment.[5] Nightingale abandoned Count 4's product-liability claim when it failed to respond to Anodyne's summary-judgment motion thereon, but Anodyne argued, without dispute, that its work on this claim was minor because a portion of the depositions of Nightingale personnel addressed it and it was, therefore, "an insignificant factor in the defense." (Reply (doc. 162) at 14).

After carefully considering the course of this case, the nature of the claims, and the allegations and evidence related thereto, we agree with Anodyne that its work on Counts 1-3 was intertwined and not practically segregable. Nightingale offers no dispute. Neither does it challenge the number of hours worked or the hourly rates charged. On our review of the declarations and billing records, we find and conclude that they are reasonable.

---

[5] As noted above, the alleged Medicare-reimbursement misrepresentation was specifically included in the Amended Complaint's Count I, being dropped only when Nightingale failed to mention it in response to Anodyne's motion for summary judgment and only after Anodyne had engaged in discovery related thereto. While Nightingale did not include Anodyne's alleged FDA-approval misrepresentation in the text of Count I, it raised it at some point in the case and argued it on summary judgment as one of Anodyne's two Lanham-Act misrepresentations.

Therefore, we GRANT Anodyne's motion for attorney fees pursuant to 15 U.S.C. § 1117(a) and will enter judgment in its favor in the amount of $72,747.00.

**SO ORDERED**

Date:  03/31/2010

*[signature: Sarah Evans Barker]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to all counsel by electronic distribution.